UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK

TYRONE WALKER,

                                        Plaintiff,

            -v.-                                        9:08-CV-1078
                                                        (TJM/ATB)
BRIAN FISCHER, *et al.*,

                                        Defendant.

APPEARANCES:                            OF COUNSEL:

TYRONE WALKER, Plaintiff *pro se*
JUSTIN C. LEVIN, Assistant Attorney General, for Defendants

ANDREW T. BAXTER, United States Magistrate Judge

## REPORT and RECOMMENDATION

This matter was referred for Report and Recommendation, pursuant to 28 U.S.C.

§ 636(b) and Local Rules N.D.N.Y. 72.3(c), by the Honorable Thomas J. McAvoy,

Senior United States District Judge.

In his Amended and Supplemental Complaints (Dkt. Nos. 42, 97), Plaintiff

alleges that Defendants violated his rights under the Eighth and Fourteenth

Amendments.  Plaintiff seeks monetary and injunctive relief.  Presently before this

court is Defendants' motion for summary judgment pursuant to Fed. R. Civ. P. 56(b).

(Dkt. No. 109).  Plaintiff responded in opposition to the motion.  (Dkt. No. 115).  For

the following reasons, the Court recommends granting Defendants motion, and

dismissing the complaint in is entirety.

## I.  **Background**

Plaintiff is an inmate in the custody and control of the New York State

Department of Correctional Services ("DOCS").[1]  (Dkt. No. 42, Am. Compl. ¶ 4).  He is

currently incarcerated at Clinton Correctional Facility ("Clinton").  (*Id.*; Dkt. No. 109-

4, Pl.'s Dep. at 13[2]).  He transferred to Clinton from Great Meadow Correctional

Facility ("Great Meadow") on January 15, 2008.  (Am. Compl. ¶ 24).

Plaintiff alleges that Defendants violated his Eighth Amendment right to

adequate medical care and Fourteenth Amendment right of equal protection under the

law by depriving him of adequate medical treatment when other similarly situated

inmates received such treatment.  (Am. Compl. ¶¶ 131, 133; Supplemental Compl. ¶¶

161-62).  He also claims the ice covering the recreation areas aggravate his medical

conditions.[3]  Additionally, Plaintiff claims that he was deprived of due process in

---

[1] On April 1, 2011, DOCS and the New York State Division of Parole were merged into one agency, named the New York State Department of Corrections and Community Supervision. Because the events relevant to this suit occurred before the merger, I will refer to New York State's corrections agency as "DOCS."

[2] All references to page numbers will be to the page numbers assigned by the court's electronic docketing system.

[3] Neither the Amended Complaint nor the Supplemental Complaint explicitly state an Eighth Amendment conditions of confinement cause of action.  Defendants, however, have construed a conditions of confinement claim.  (Dkt. No. 109-2, Defs.' Mem. of Law at 20-21). Accordingly, the Court will also analyze whether Defendants are entitled to summary judgment on a conditions of confinement claim.  *See Burgos v. Hopkins*, 14 F.3d 787, 790 (2d Cir. 1994) (holding that were a party is proceeding *pro se*, the court must "read [his or her] supporting papers liberally, and interpret them to raise the strongest arguments that they suggest.").

violation of the Fourteenth Amendment when he was placed under a restraint order without being issued a misbehavior report.  (Am. Compl. ¶ 123).  Finally, although Plaintiff does not explicitly state an Eighth Amendment cause of action arising from the restraint orders, the restraints may also implicate the Eighth Amendment as Plaintiff has claimed that prison officials placed him in restraints "as a form of punishment."  (Pl.'s Dep. at 70).

### A.   Plaintiff's Medical Conditions

#### 1.   Foot Pain

Plaintiff was diagnosed with plantar fasciitis in November 2007 while he was incarcerated at Great Meadow.  (Dkt. No. 111, Pl.'s Medical R. I at 84).  Plantar fasciitis is an inflammation of the plantar fascia, which is a thick band of tissue that "runs across the bottom of the foot and connects the heal bone to the toes."  (Johnson Decl. ¶ 19; Lashway Decl. ¶ 21).  The condition causes pain in the feet.  (Pl.'s Medical R. I at 84).  Treatment options include rest, stretching, and orthotic shoe inserts. (Johnson Decl. ¶ 20; Lashway Decl. ¶ 22; Pl.'s Medical R. I at 84).  Dr. Thompson, who diagnosed Plaintiff with plantar fasciitis at Great Meadow, noted that "orthotics would help with [the condition] and boots would also help give . . . support to help this condition."  (Pl.'s Medical R. I at 84).

Plaintiff also claims that he suffers from Raynaud's Syndrome.  (Am. Compl. ¶

3

21; Pl.'s Dep. at 31).  Raynaud's Syndrome "is a condition in which blood vessels in the hands and feet appear to overreact to cold."  (Johnson Decl. ¶ 31; Lashway Decl. ¶ 33).  Plaintiff says that his "feet become painfully cold when there is a slight decrease in temperature" even if his overall body temperature remains warm.  (Am. Compl. ¶ 21).  Plaintiff admits that he has never been diagnosed with Raynaud's Syndrome and admits that there is no indication of it in his medical file, but he claims that a doctor and a physician have told him that he has it.  (Pl.'s Dep. at 31).  He believes that medical boots will help with this condition too.  (Pl.'s Dep. at 34).

Plaintiff wants to wear his medical boots at all times, or, at the very least, when he leaves his cell to go to recreation or to other call-outs within the facility.  (Pl.'s Dep. at 42).  He also wants to be able to keep the medical boots at the back of his cell so that he has access to them whenever he leaves his cell.  (Pl.'s Dep. at 43-44).  Currently, Plaintiff is allowed to wear his boots when he goes on "outside trips."  (Defs. 7.1 Statement ¶ 12; Pl.'s 7.1 Statement ¶ 12).  Clinton's medical staff concluded that the "boots were only medically necessary when he went on outside trips that required extensive walking."  (Defs.' 7.1 Statement ¶ 11; *see also* Dkt. No. 111-1, Pl's Medical R. II at 165, 172, 182).  Medical staff provided Plaintiff with orthotic inserts and painkillers, and they recommended exercises to ease his discomfort.  (Defs.' 7.1 Statement ¶¶ 4-5, 7, 13; Pl.'s 7.1 Statement ¶¶ 4-5, 7, 11).

2.      Back Pain

Plaintiff claims that he injured his back on February 18, 2009, while attempting "cherry picker" exercises[4] in his cell.  (Dkt. No. 97, Pl.'s Supplemental Compl. ¶ 142). The next day, Plaintiff informed Defendant Amber Lashway, a nurse practitioner at Clinton during the events giving rise to this action, that he was experiencing back pain. (*Id.*; Lashway Decl. ¶ 57).  Defendant Lashway prescribed Phenylgesic, which is a painkiller made from acetaminophen and phenyltolox.  (Pl.'s Medical R. I at 96). Approximately one week later on February 27, 2009, Plaintiff told Defendant Lashway that the medication was "doing little to subside the pain in the back . . . ."  (Pl.'s Supplemental Compl. ¶ 143).  Defendant Lashway allegedly told Plaintiff to continue taking the Phenylgesic and that he would not be receiving stronger medication.  *Id.*

Two months later, on April 30, 2009, Plaintiff complained again to Defendant Lashway about back pain.  (Lashway Decl. ¶ 63; Pl.'s Supplemental Compl. ¶ 145). Defendant Lashway "concluded that [Plaintiff] . . . was exhibiting drug-seeking behavior."  (Lashway Decl. ¶ 64).  Once again, Defendant Lashway told Plaintiff that he would not receive stronger medication, but continued the Phenylgesic and recommended a home exercise program for treating back pain.  (Lashway Decl. ¶¶ 64-

---

[4] Plaintiff describes this exercise as "having your hands touching your toes."  (Pl.'s Supplemental Compl. ¶ 142).

65; Pl.'s Supplemental Compl. ¶ 145).  One of these exercises was supposedly "similar to the cherry pickers exercise."  (Pl.'s Supplemental Compl. ¶ 145).  After a couple of weeks of completing the other exercises successfully, Plaintiff claims that he injured his back even more by "attempt[ing] to do the [exercise that was] like the cherry picker exercise . . . ."  *Id.*

Defendant Lashway conducted a followup examination of Plaintiff's back on May 28, 2009.  (Lashway Decl. ¶ 67).  She states that examination was normal and that "it revealed no functional deficits."  (Lashway Decl. ¶ 68; *see also* Dkt. No. 111-2, Pl.'s Medical R. III at 29).  Plaintiff, however, claims that he was "experienc[ing] excruciating back pain."  (Dkt. No. 115, Pl.'s 7.1 Statement ¶ 52).  Plaintiff wanted an x-ray of his back but Defendant Lashway said that an x-ray was not medically indicated.  (Lashway Decl. ¶ 69).  Defendant Lashway, however, submitted a physical therapy consult to address Plaintiff's complaints.  *Id.* ¶ 71.  On June 2, 2009, Dr. Gerald Amatucci,[5] the Regional Medical Director, denied the consult "because of a lack of medical necessity at the time."  *Id.* ¶ 73.  On September 1, 2009, Defendant Lashway submitted another physical therapy consult, which was also denied "because of a lack of medical necessity."  *Id.* ¶ 76.[6]

_____

[5]  Dr. Amatucci is not a party to this action.

[6]  Plaintiff has admitted to paragraphs 69, 71, 73, and 76, of Defendant Lashway's Declaration.  (*See* Pl.'s 7.1 Statement ¶¶ 53, 55, 58, 61).

3.      Gastrointestinal Problems

Plaintiff has complained of constipation, stomach cramps, and hemorrhoids. (Am. Compl. ¶¶ 42, 59, 61-63, 65, 67; Pl.'s Dep. at 48-49).  He complains that the "Controlled A Diet," which is a high fiber diet that Plaintiff receives to treat constipation and hemorrhoids, consists of "bland food."  (Pl.'s Dep. at 51; Dkt. No. 109-1, Defs.' 7.1 Statement ¶ 24; Dkt. No. 115, Pl.'s 7.1 Statement ¶ 24).  He also claims that the diet consists of too much meat, insufficient wheat bread and fresh fruits, and overcooked vegetables.  (Pl.'s Dep. at 51-52).  Plaintiff states that this diet is "ineffective," and that the "Cold Alternative Diet" (also known as Kosher Diet) would better treat his digestive problems.  (Pl.'s 7.1 Statement ¶¶ 25, 28).  Rabbi Alec H. Friedman[7] is accused of denying Plaintiff's request for the Kosher Diet because Plaintiff is Muslim.  (Defs.' Mem. of Law at 16; *see also* Dkt. No. 115-7, Pl.'s Exh. 30).

In addition to a high fiber diet, Plaintiff also receives Metamucil to ease his constipation, which Plaintiff admits has been "pretty effective."  (Defs.' 7.1 Statement ¶¶ 21-23; Pl.'s 7.1 Statement ¶¶ 21-23; Pl.'s Dep. at 50).  Defendants have also provided Plaintiff with ointment to treat his hemorrhoids, which Plaintiff acknowledges has helped "[c]onsiderably."  (Defs.' 7.1 Statement ¶¶ 29-31; Pl.'s 7.1 Statement ¶¶ 29-31; Pl.'s Dep. at 50).

---

[7]  Rabbi Friedman is not a party to this action.

### 4.    Vision Problems

Plaintiff's eyesight has deteriorated since his incarceration.  (Pl.'s Dep. at 58).

He states that he had 20/20 vision when he was arrested approximately twenty years

ago, but he now needs bifocals.  *Id.*  Plaintiff also accuses Defendants of ignoring his

light sensitivity.  (Am. Compl. ¶ 89).  This sensitivity causes headaches and makes it

difficult for Plaintiff to go to the recreation because the sunlight hurts his eyes.  (*Id.*;

Pl.'s Dep. at 59).  He must also leave the lights off in his cell due to the sensitivity.

(Pl.'s Dep. at 60).  Plaintiff's requests for "photo-ray or tinted glasses" were denied.

(Am. Compl. ¶ 90).

### 5.    Dental Issues

Plaintiff accuses Defendants of ignoring his dental problems.  (Am. Compl. ¶¶

98-100).  Plaintiff lost his partial dentures when he transferred to Clinton from Great

Meadow in January 2008.  (Am. Compl. ¶ 98).  He suffers from a receding gum line,

which causes pain and swelling.  *Id.*  He was also scheduled to have this teeth cleaned

but that has not occurred.  *Id.*  He claims that he has only seen a dentist once and that no

treatment has been provided.  (Pl.'s Dep. at 62).

### 6.    Colonoscopy

Plaintiff alleges that Defendants were deliberately indifferent to his serious

medical needs by delaying a colonoscopy.  (Am. Compl. ¶¶ 101-09).  Plaintiff canceled

a colonoscopy in September 2008 because he believed that Dr. Shah had lied to him regarding potential complications that might arise from the procedure.  *Id.* ¶¶ 101-02. Plaintiff claims that his medical conditions increased the threat of colon cancer because he has a history of the disease in his family.  *Id.* ¶ 72.  He requested either another doctor or an alternative procedure shortly after canceling his procedure with Dr. Shah; but Plaintiff did not have a colonoscopy until March 2008.  (*Id.* ¶ 103; Dkt. No. 115-7, Pl.'s Exh. 30).

### B.    Recreation Area Conditions

Plaintiff complains that the floor of the recreation cages are completely covered with ice that is at least six inches thick, making his feet "extremely painfully cold" due to his Raynaud's Syndrome.  (Am. Compl. ¶ 33).  While prison officials provide galoshes, Plaintiff states that they do not protect his feet.  (Pl.'s Dep. at 55-56).  He refrains from going to recreation because the snow and ice compound the problems with his feet.  *Id.* at 57.  Plaintiff requests medical boots to insulate his feet when he goes to recreation.  (Am. Compl. ¶ 33).

### C.    Restraint Order

Plaintiff was placed on a restraint order on December 10, 2008, because he "made threatening statements regarding fighting in the S.H.U. Visiting Room with other S.H.U. inmates."  (Dkt. No. 109-12, Racette Exh. D).  Waist restraints, leg irons,

and handcuffs were to remain on Plaintiff while he was in the visiting area.  *Id.*

Plaintiff states that he was never given a misbehavior report for this restraint order,

violating his due process rights.  (Am. Compl. ¶ 117; Pl.'s Dep. at 70).  He also claims

that the restraints were "too tight" and that prison officials were "trying to torture" him.

(Pl.'s Dep. at 68).  The leg irons also aggravate problems with his feet.  *Id.* at 68-69.

The restraint order was lifted on June 20, 2010.  (Dkt. No. 109-12, Racette Decl. ¶ 18).

## II.   Legal Standard for Summary Judgment

Summary judgment is appropriate where there exists no genuine issues of

material fact and, based on the undisputed facts, the moving party is entitled to

judgment as a matter of law.  Fed. R. Civ. P. 56; *Salahuddin v. Goord*, 467 F.3d 263,

272-73 (2d Cir. 2006).  "Only disputes over ['material'] facts that might affect the

outcome of the suit under the governing law will properly preclude the entry of

summary judgment."  *Anderson v. Liberty Lobby*, 477 U.S. 242, 248, 106 S. Ct. 2505,

91 L. Ed. 2d 202 (1986).  It must be apparent that no rational finder of fact could find in

favor of the non-moving party for a court to grant a motion for summary judgment.

*Gallo v. Prudential Residential Servs.*, 22 F.3d 1219, 1224 (2d Cir. 1994).

The moving party has the burden to show the absence of disputed material facts

by informing the court of portions of pleadings, depositions, and affidavits which

support the motion.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S. Ct. 2548, 91 L.

Ed. 2d 265 (1986).  If the moving party satisfies its burden, the non-moving party must move forward with specific facts showing that there is a genuine issue for trial. *Salahuddin v. Goord*, 467 F.3d at 273.  In that context, the non-moving party must do more than "simply show that there is some metaphysical doubt as to the material facts." *Matushita Electric Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586, 106 S. Ct. 1348, 89 L. Ed. 2d 538 (1986).

In determining whether there is a genuine issue of material fact, a court must resolve all ambiguities, and draw all inferences, against the movant.  *See United States v. Diebold, Inc.*, 369 U.S. 654, 655, 82 S. Ct. 993, 8 L. Ed. 2d 176 (1962); *Salahuddin v. Goord*, 467 F.3d at 272. "[I]n a *pro se* case, the court must view the submissions by a more lenient standard than that accorded to 'formal pleadings drafted by lawyers.'" *Govan v. Campbell*, 289 F. Supp. 2d 289, 295 (N.D.N.Y. 2007) (citing, *inter alia*, *Burgos v. Hopkins*, 14 F.3d at 790.  "However, a *pro se* party's 'bald assertion,' completely unsupported by evidence, is not sufficient to overcome a motion for summary judgment."  *Lee v. Coughlin*, 902 F. Supp. 424, 429 (S.D.N.Y. 1995) (citing *Carey v. Crescenzi*, 923 F.2d 18, 21 (2d Cir. 1991)).

## III.  **Personal Involvement**

### A.    **Legal Standards**

In order to hold an individual liable for damages in a section 1983 action,

11

plaintiff must allege that the individual was "personally involved" in the constitutional violation of which he complains. *Farrell v. Burke*, 449 F.3d 470, 484 (2d Cir. 2006); *Wright v. Smith*, 21 F.3d 496, 501 (2d Cir. 1994) ("It is well settled in this Circuit that personal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under § 1983.")  The Second Circuit has detailed the various ways in which a defendant can be personally involved in a constitutional deprivation. *See Williams v. Smith*, 781 F.2d 319, 323-24 (2d Cir. 1986).  A supervisory official is said to have been personally involved if that official directly participated in the infraction. *Id.* at 323.  Personal involvement may be shown if, after learning of a violation through a report or appeal, the supervisory official failed to remedy the wrong. *Id.*  Personal involvement may exist if the official created a policy or custom under which unconstitutional practices occurred or allowed such a policy or custom to continue. *Id.*  Finally, a supervisory official may be personally involved if he or she were grossly negligent in managing subordinates who caused the unlawful condition or event. *Id.* at 323-24; *see also Iqbal v. Hasty*, 490 F.3d 143, 152-53 (2d Cir. 2007) (citing *Colon v. Coughlin*, 58 F.3d 865, 873) (2d Cir. 1995)), *rev'd on other grounds*, ___ U.S. ___, 129 S. Ct. 1937, 173 L. Ed. 2d 868 (2009).

The "mere receipt of letters from an inmate by a [supervisory official] regarding a medical claim is insufficient to constitute personal liability." *Gonzales v. Wright*, No.

9:06-CV-1424 (JMH), 2010 WL 681323, at *10 (N.D.N.Y. Feb. 22, 2010) (Hood, J.) (citations omitted); *see also Booker v. Doe*, No. 9:06-CV-73 (GLS), 2008 WL 4527601, at *7 (N.D.N.Y. Sept. 30, 2008) (Sharpe, J.) ("It is now well-settled that the failure of a supervisory official to investigate a letter of protest written by an inmate is not sufficient to show personal involvement."). Moreover, a supervisor's referral of a complaint to a subordinate for investigation does not constitute personal involvement. *Sealey v. Giltner*, 116 F.3d 47, 51 (2d Cir. 1997); *see also Wright v. Genovese*, 694 F. Supp. 2d 137, 161 (N.D.N.Y. 2010) (Kahn, J.) (adopting magistrate judge's finding that an inmate's letter of complaint to a supervisor was insufficient to establish personal involvement by the supervisor because the supervisor referred the matter to a subordinate for decision and did not personally make any decisions regarding the inmate); *Vega v. Artus*, 610 F. Supp. 2d 185, 199 n.13 (N.D.N.Y. 2009) (Suddaby, J.) ("Prison supervisors are entitled to refer letters of complaint to subordinates, and rely on those subordinates to conduct an appropriate investigation and response, without rendering the supervisors personally involved in the constitutional violations alleged in the letters of complaint."). However, personal liability may lie where a "supervisor's 'involvement went beyond merely the receipt of complaint letters,' to 'responding, explaining the treatment and defending the institution.'" *Woods v. Goord*, No. 01 Civ. 3255 (SAS), 2002 WL 731691, at *7-9 (S.D.N.Y. Apr. 23, 2002) (Schendlin, J.)

13

(internal citations omitted); *see also Rashid v. Hussain*, No. 95- Civ. 676, 1997 WL

642549, at *3 (N.D.N.Y. Oct. 15, 1997) (Pooler, J.).

**B.     Analysis**

1.     Defendant Fischer

Defendant Brian Fischer began serving as DOCS Commissioner on March 12,

2007.  (Dkt. No. 109-7, Fischer Decl. ¶¶ 1, 3).  He served as Acting Commissioner from

January 1, 2007, to March 12, 2007.  *Id.* ¶ 2.  Plaintiff wrote a letter to Defendant

Fischer on April 22, 2008, complaining about the deprivation of the medical boots.

(Dkt. No. 109-7, Fischer Exh. A; Dkt. No. 115-3, Pl.'s Exh. 10).  On November 10,

2009, Plaintiff wrote another letter to Defendant Fischer which "mention[ed] the

crippling and painful effect of his back condition."  (Supplemental Compl. ¶ 149; Dkt.

No. 109-7, Fischer Exh. C).  Defendant Fischer did not respond to these letters

personally.  (Fischer Decl. ¶ 18).  Rather, Defendants Lester Wright and Lucien

LeClaire responded to these letters on Defendant Fischer's behalf.  (Dkt. No. 109-7,

Fischer Exhs. C-E; Dkt. No. 115-3, Pl.'s Exh. 10; Supplemental Compl. ¶ 150).  Due to

the large volume of letters that Defendant Fischer receives from inmates or others on

their behalf, Defendant Fischer's secretaries read these letters and forward them to

other individuals who may respond on Defendant Fischer's behalf.  (Fischer Decl. ¶¶

11-15).

14

Without more, even construing the facts in the light most favorable to Plaintiff, Plaintiff has failed to allege, let alone establish, any factual basis upon which a jury could reasonably conclude personal involvement by Defendant Fischer.  Neither the mere receipt of a complaint nor the delegation to a subordinate to respond to the complaint are sufficient to establish personal involvement.

Accordingly, I recommend that Defendant Fischer be granted summary judgment.

### 2.    Defendant LaValley

Plaintiff alleges that Defendant Thomas LaValley, who was Clinton's First Deputy Superintendent during the time of the events giving rise to this action, directed a formal complaint to another person for review.  (Am. Compl. ¶ 28).  This allegation alone would be insufficient to subject Defendant LaValley to personal liability.  The record, however, reveals several instances where Defendant LaValley responded to Plaintiff's formal complaints by explaining and defending the alleged constitutional deprivations.  (Dkt. No. 109-5, Artus Exhs. A-C).  These responses may be sufficient to subject Defendant LaValley to personal liability if the deprivations violated the Constitution.[8]

---

[8]  Whether the deprivations violated the Constitution is discussed below.  *See infra* Point IV(A).

Accordingly, Defendant LaValley should not be granted summary judgment on this basis.

### 3. Defendant Bezio

Defendant Jeffrey Bezio, a sergeant at Clinton, argues that he was not personally involved in any constitutional violation because the denial of the medical boots did not violate the Constitution. (Defs.' Mem. of Law at 27). The standard, however, requires that the plaintiff allege personal involvement in the "*alleged* constitutional deprivations." *See Wright v. Smith*, 21 F.3d at 501 (emphasis added). Defendant Bezio is accused of denying Plaintiff the use of medical boots in violation of the Eighth and Fourteenth Amendments. (Am. Compl. ¶ 25). Defendant Bezio, citing policy, admits to denying Plaintiff access to medical boots on at least one occasion. (Dkt. No. 109-6, Bezio Decl. ¶ 9). Thus, Plaintiff has sufficiently alleged Defendant Bezio's personal involvement in an *alleged* constitutional violation.[9]

Accordingly, Defendant Bezio should not be granted summary judgment on this basis.

### 4. Defendant Artus

Defendant Dale Artus was the Superintendent of Clinton during the time of the

---

[9] Whether the deprivation of the medical boots violated the Constitution is discussed below. *See infra* Point IV(A).

16

events giving rise to this action.  (Dkt. No. 109-5, Artus Decl. ¶ 4).  The record reveals

a number of letters and grievances from Plaintiff to Defendant Artus, in which Plaintiff

complained of the lack of medical treatment and other prison conditions.  (*See*

*generally* Artus Decl.).  Plaintiff also claims that he complained to Defendant Artus

personally when Defendant Artus "walked on the rounds."  (Pl.'s Dep. at 95).

Defendant Artus states that all complaints from Plaintiff were delegated to Defendant

Artus's subordinates for review and action.  (Artus Decl. ¶¶ 11, 13, 16, 18, 20, 28, 36,

38).  Plaintiff concedes that Defendant Artus referred most, if not all, of these matters to

subordinates.  (Am. Compl. ¶¶ 28, 32; Supplemental Compl. ¶ 152).

　　　　Other than to inform Plaintiff that his complaints were referred to subordinates

for review, the record fails to reveal any responses from Defendant Artus that could

subject him to personal liability.[10]  (Dkt. No. 109-5, Artus Exhs. D, H, I; Dkt. No. 115-

7, Pl.'s Exh. 32).  Defendant Artus did not respond to any of the grievance appeals

directly.  (Dkt. No. 109-5, Artus Exhs. A, B, C; Dkt. No. 115-3, Pl.'s Exhs. 7, 9; Dkt.

No. 115-4, Pl.'s Exh. 15; Dkt. No. 1155, Pl.'s Exh. 19; Dkt. No. 115-6, Pl.'s Exhs. 26-

27; Dkt. No. 112-7, Pl.'s Exhs. 28, 38).  Plaintiff argues that Defendant Artus

responded to Grievance #CL-56794-08; but that response bears the signature of

───────────────

[10]  Also contained in the record are memoranda from Defendant Artus to Plaintiff modifying
Plaintiff's keeplock and S.H.U. confinement times. (Dkt. No. 115-6, Pl.'s Exh. 21).  Those matters
are not at issue in the pending action.

17

Defendant Thomas LaValley, who was then Clinton's First Deputy Superintendent. (Dkt. No. 109-5, Artus Exh. A.; Dkt. No. 109-10, LaValley Decl. ¶ 4).  Thus, the record fails to show any personal involvement by Defendant Artus.

Accordingly, Defendant Artus should be granted summary judgment on this basis.[11]

## IV.   **Eighth Amendment**

The Eighth Amendment to the United States Constitution prohibits "cruel and unusual" punishment.  The word "punishment" refers not only to deprivations imposed as a sanction for criminal wrongdoing, but also to deprivations suffered during imprisonment.  *Estelle v. Gamble*, 429 U.S. 97, 102-03 (1976).  Punishment is "cruel and unusual" if it involves the unnecessary and wanton infliction of pain or if it is incompatible with "the evolving standards of decency that mark the progress of a maturing society."  *Id.* at 102.  In fulfilling this duty, prison officials must "ensure that inmates receive adequate food, clothing, shelter, and medical care, and must 'take

---

[11] Plaintiff also argues that Defendants Fischer, LaValley, and Artus were personally involved by claiming that they used DOCS Directive 4933 to deny the medical boots.  (Dkt. No. 115-1, Pl.'s Mem. of Law at 26).  Plaintiff relies on their responses to interrogatories where they admit that the directive does not address every item that is prohibited in S.H.U.  (*Id.*; Dkt. No. 115-4, Pl.'s Exh. 12; Dkt. No. 115-7, Pl.'s Exhs. 32, 33).  It appears that Plaintiff is attempting to assert that those Defendants created or allowed a policy or custom under which unconstitutional practices occurred.  Even after reading Plaintiff's papers liberally, however, there is no indication that the directive contributed to unconstitutional practices, especially when both Defendants Fischer and LaValley stated that exceptions to prohibited items may be allowed for medical reasons.  (Dkt. No. 115-4, Pl.'s Exh. 12; Dkt. No. 115-7, Pl.'s Exh. 33).

reasonable measures to guarantee the safety of the inmates.'"  *Farmer v. Brennan*, 511 U.S. 825, 832 (1994) (quoting *Hudson v. Palmer*, 468 U.S. 517, 526-27 (1984)).  While the Eighth Amendment does not mandate comfortable prisons, neither does it tolerate inhumane treatment of those in confinement.  *Id.* at 832 (citing *Rhodes v. Chapman*, 452 U.S. 337, 349 (1981)).  A viable Eighth Amendment claim must contain both an objective and a subjective component.  *Farmer v. Brennan*, 511 U.S. at 834.

### A.    Medical Indifference

#### 1.    Legal Standards

Deliberate indifference to a convicted prisoner's serious medical needs constitutes cruel and unusual punishment, in violation of the Eighth Amendment, as made applicable to the states through the Fourteenth Amendment.  *Estelle v. Gamble*, 429 U.S. at 106.  There are two elements to the deliberate indifference standard.  *Smith v. Carpenter*, 316 F.3d 178, 183-84 (2d Cir. 2003).  The first element is objective and measures the severity of the deprivation, while the second element is subjective and ensures that the defendant acted with a sufficiently culpable state of mind.  *Id.*

The objective prong of the standard is satisfied "when (a) the prisoner was 'actually deprived of adequate medical care,' meaning prison officials acted unreasonably in response to an inmate health risk under the circumstances, and (b) 'the inadequacy in medical care is sufficiently serious.'"  *Bellotto v. County of Orange*, 248

F. App'x 232, 236 (2d Cir. 2007) (quoting *Salahuddin v. Goord*, 467 F.3d at 279-80). If the "unreasonable care" consists of a failure to provide any treatment, then the court examines whether the inmate's condition itself is "sufficiently serious." *Smith v. Carpenter*, 316 F.3d 178, 185-86 (2d Cir. 2003). When a prisoner alleges "a temporary delay or interruption in the provision of otherwise adequate medical treatment," the court must focus on the seriousness of the particular risk of harm that resulted from the "challenged *delay* or *interruption*, rather than the prisoner's *underlying medical condition* alone." *Id.* at 185 (emphasis in original). The standard for determining when a deprivation or delay in a prisoner's medical need is sufficiently serious, contemplates a condition of urgency that may result in degeneration of the patient's condition or extreme pain. *Bellotto v. County of Orange*, 248 F. App'x at 236 (citing *Chance v. Armstrong*, 143 F.3d 698, 702 (2d Cir.1998) and *Smith v. Carpenter*, 316 F.3d at 187 (actual medical consequences are highly relevant)).

The subjective prong of the deliberate indifference test is satisfied when an official "knows that inmates face a substantial risk of serious harm and disregards that risk by failing to take reasonable measures to abate it." *Farmer v. Brennan*, 511 U.S. at 847. A plaintiff is not required to show that a defendant acted or failed to act "for the very purpose of causing harm or with knowledge that harm will result," but must show that the official was aware of facts from which one could infer that "a substantial risk of

serious harm" exists, and that the official drew that inference. *Id.* at 835, 837.

A plaintiff's disagreement with prescribed treatment does not rise to the level of a constitutional claim. *Sonds v. St. Barnabas Hosp. Corr. Health Servs.*, 141 F. Supp. 2d 303, 311 (S.D.N.Y. 2011) (McMahon, J.). An inmate does not have the right to treatment of his choice. *Dean v. Coughlin*, 804 F.2d 207, 215 (2d Cir. 1986). Even if the medical judgments of prison staff amount to negligence or malpractice, malpractice does not become a constitutional violation simply because the plaintiff is an inmate. *Kellam v. Hunt*, No. 9:04-CV-1225 (LEK/GJD), 2007 WL 2764814, at *6 (N.D.N.Y. Sept. 20, 2007) (Kahn, J.). Moreover, "the fact that a course of treatment is unsuccessful does not . . . establish medical malpractice. . . . *A fortiori*, it cannot support a finding of deliberate indifference since deliberate indifference requires a level of culpability beyond malpractice." *Ramos v. Artuz*, No. 00 Civ. 149, 2003 WL 342347, at *9 (S.D.N.Y. Feb. 14, 2003) (Swain, J.). Finally, penological interests may also inform the decision on the type of care a prisoner receives. *See Estelle v. Gamble*, 429 U.S. at 103.

        2.    Analysis

Plaintiff alleges that he was denied adequate medical treatment for his foot and back pain, and digestive, vision, and dental problems. (*See generally* Am. Compl.; Supplemental Compl.). Even assuming that these conditions were sufficiently serious, a review of the record shows that Defendants did not act with deliberate indifference in

21

responding to these medical needs.  Rather, the record shows a number of disagreements between Plaintiff's wishes and the medical care Defendants' provided, which is insufficient to make a constitutional claim of deliberate indifference.

Moreover, in refusing to prescribe stronger back pain medication, Defendant Lashway was entitled to her own medical judgment that Plaintiff showed drug-seeking behavior.  *See Wright v. Genovese*, 694 F. Supp. 2d at 160 ("concern about prescribing narcotic pain medication, on which inmates with possible substance abuse issues could become dependent, may inform a medical judgment about what drug to prescribe").

Additionally, Clinton's security staff had legitimate penological interests for refusing Plaintiff's request to keep his medical boots in his cell.  They determined that doing so "present[ed] an unacceptable security threat to the safety of staff and other inmates."  (Racette Decl. ¶ 34).  Defendant Racette states that a boot that contains plastic instead of metal may still pose a threat because the "hard plastic" that is used to make the boots' support structures "could easily [be] fashion[ed] [into] a stabbing instrument," and that a plastic weapon poses a greater threat because metal detectors will not be able to detect it.  *Id.* ¶¶ 37, 39-40.  The record also shows that Plaintiff had been placed in restraints in March and April 2008 because he had "assaulted [and] seriously injured several [Clinton] staff members using weapons (shanks)" and "on numerous occasions [Plaintiff] made threats to staff."  (Dkt. No. 115-7, Pl.'s Exh. 34).

Therefore, depriving Plaintiff of his medical boots at all times served the legitimate penological purpose of protecting prison staff and other inmates.

Plaintiff has also failed to show that Defendants acted with deliberate indifference to his vision problems. Citing an eye examination record, Plaintiff claims that he was diagnosed by an optometrist of having light sensitivity in May 2008. (Defs.' 7.1 Statement ¶ 69). That record, however, notes that Plaintiff had complained of light sensitivity, not that he was diagnosed with it. (Pl.'s Medical R. I at 76). Moreover, a subsequent eye examination in July 2008 makes no reference to light sensitivity at all. (Pl.'s Medical R. at 78). Plaintiff was told once again in December 2009 that the optometrist did not prescribe tinted glasses because the optometrist concluded that tinted glasses were not indicated despite Plaintiff's complaints. (Pl's Medical R. at 70). Notably, although Plaintiff has not received the tinted glasses that he desires, Plaintiff "repeatedly" been "issued eyeglasses to correct his vision." (Pl's 7.1 Statement ¶ 71).

Further, Plaintiff's claim that the failure to place him on the Kosher Diet resulted in "[s]evere internal hemorrhoids" in March 2009 is speculative. (Pl.'s Mem. of Law at 14). He offers no support for that proposition. At worst, any link between the denial of the Kosher Diet and the diagnosis of severe hemorrhoids might show medical malpractice, but not deliberate indifference. After reviewing the record, the Court

concludes that Defendants were not deliberately indifferent to Plaintiff's gastrointestinal and hemorrhoid problems.  Defendants provided a hemorrhoid ointment, fiber supplements, and a high fiber diet.  (Pl.'s Medical R. I at 162, 167, 173, 179; Pl.'s Medical R. II at 188; Pl.'s Medical R. III at 2, 49, 52).  Plaintiff has admitted that the Metamucil has been "pretty effective" in alleviating his constipation and that the ointment has helped "[c]onsiderably" with his hemorrhoids.  (Pl.'s Dep. at 50).  While Plaintiff later refused the Controlled A Diet, claiming that it did not work (Pl.'s Medical R. III at 13), the Constitution does not require that Plaintiff receive the care of his choice.  Rather, the Constitution requires only that an inmate receive adequate medical care.

       In addition, Plaintiff cannot show the personal involvement of any Defendant in treating (or in failing to treat) his dental problems.  Defendants submit—and Plaintiff admits—that "[d]ental professionals [at Clinton] receive professional supervision from the director of their discipline."  (Defs.' 7.1 Statement ¶ 77; Pl.'s 7.1 Statement ¶ 77).  When "an inmate complains about dental issues to medical staff, medical staff must refer such complaints to the dental department."  (Defs.' 7.1 Statement ¶ 77; Pl.'s 7.1 Statement ¶ 77).  Plaintiff admits—and the record shows—that Clinton's medical staff have referred his concerns to the dental department.  (Pl.'s 7.1 Statement ¶ 80; *see also* Pl.'s Medical R. I at 12, 13, 135, 141, 147; Pl.'s Medical R. II at 106-07; Pl.'s Medical

24

R. III at 47). As such, Defendants responded appropriately to Plaintiff's dental conditions, and Plaintiff cannot show the personal involvement of any Defendants in the alleged constitutional deprivations.

Finally, there is no indication that the five-month delay in providing a colonoscopy was the result of Defendants' deliberate indifference to Plaintiff's serious medical needs. A genetic disposition to colon cancer is insufficient to constitute a serious medical condition because it is not a condition of urgency that may result in degeneration of the condition or extreme pain. Moreover, the delay did not expose Plaintiff to a greater risk of colon cancer. In fact, the colonoscopy did not reveal any cancer at all. *Id.*

Accordingly, Defendants should be granted summary judgment as to Plaintiff's medical indifference claims.

**B.   Restraints**

    1.   <u>Legal Standards</u>

Pursuant to DOCS Directive 4933 § 305.4(a), "[a]ny inmate assigned to an [S.H.U.] who has a history of assaultive behavior and/or who presents a threat to the safety or security of himself/herself, other persons, or State property may be placed under a restraint order by the deputy superintendent for security or, in his/her absence, the [officer of the day] or higher ranking authority." Prison officials have wide latitude

to place restraints on inmates and only violate the Eighth Amendment if the imposed

restraint is "totally without penological justification, grossly disproportionate, or

involves the unnecessary and wanton infliction of pain." *Horne v. Coughlin*, 155 F.3d

26, 31 (2d Cir. 1998) (citations omitted).

      2.  <u>Analysis</u>

In this case, the imposition of the restraint orders did not violate Plaintiff's rights

under the Due Process Clause.  Defendants intercepted a letter, dated December 4,

2008, that Plaintiff wrote to his brother where Plaintiff threatened to "kill one of these

bitches in this box down with the police" and that the "only time [Plaintiff] can get at

one of these bitches is on the visit because we out of restraints, so if you decide to ever

come visit again be ready to get it on, I fight we all fight that's how we go."  (Dkt. No.

109-12, Racette Exh. B). Later, in June 2009, the Deputy Superintendent of Elmira

Correctional Facility also intercepted a letter where Plaintiff threatened to kill another

inmate who was in a rival gang.  (Dkt. No. 109-12, Racette Exh. C).

Defendants interpreted these letters as a threat to other inmates in Clinton's

S.H.U.  (Dkt. No. 109-12, Racette Decl. ¶¶ 7, 16-17).  Plaintiff has been assigned to

S.H.U. throughout his entire incarceration at Clinton. (Defs.' 7.1 Statement ¶ 8; Pl.'s

7.1 Statement ¶ 8).  The initial restraint order on December 10, 2008, was placed on

Plaintiff because he had "made threatening statements regarding fighting in the S.H.U.

visiting room with other S.H.U. inmates." (Dkt. No. 109-12, Racette Exh. D). Each

subsequent restraint order was issued for the same reason." *Id.*

Plaintiff contends he was not a threat to security. (Dkt. No. 115-1, Pl.'s Mem. of

Law at 20-25). He argues that the first letter was a ploy that he had learned from a

psychology book to create an urgent situation so that his brother would visit. *Id.* at 19-

20. Plaintiff also claims that the second letter should not be admitted as evidence

because he does not remember writing it, that it is undated, and that a deputy

superintendent would not be in the position to intercept letters as a deputy

superintendent would not work in the mail room. *Id.* at 24.[12] Even if Plaintiff's claims

are true, he has not raised any issue of material fact that would permit a reasonable juror

to conclude that Defendants acted "totally without penological justification," that the

restraints were "grossly disproportionate," or that they "involve[d] the unnecessary and

wanton infliction of pain." While Plaintiff believes that he does not present a threat to

other inmates in S.H.U., Defendants were authorized to impose the restraint orders

under DOCS regulations, and they did so for a legitimate, penological purpose (i.e.

ensuring the safety of other persons) after intercepting correspondence that they

interpreted as Plaintiff's threats to other inmates. Plaintiff was not required to wear

---

[12] It should be noted that the second letter bears the same salutation and signature as the first letter, which Plaintiff acknowledges writing. (Dkt. No. 109-12, Racette Exhs. B-C).

restraints when he was in recreation or in his cell.  (Pl.'s Dep. at 66; Dkt. No. 109-12,

Racette Exh. D).   The restraint orders were lifted in June 2010 after the inmate that

Plaintiff had threatened to harm was transferred to another facility.  (Racette Decl. ¶ 18;

Pl.'s 7.1 Statement ¶ 95).  Thus, there is no indication that the restraints were grossly

disproportionate to the perceived threat.

Accordingly, Defendants should be granted summary judgment on this basis.

**C.      Ice in the Recreation Areas**

1.      <u>Legal Standards</u>

In order to state a valid conditions-of-confinement claim under the Eighth

Amendment, a plaintiff must allege that: (1) the conditions were so serious that they

constituted a denial of the "minimal civilized measure of life's necessities," and (2)

prison officials acted with "deliberate indifference."  *Wilson v. Seiter*, 501 U.S. 294,

297-99 (1991) (cited in *Branham v. Meachum*, 77 F.3d 626, 630-31 (2d Cir. 1996)).

To satisfy the objective element, the plaintiff must demonstrate that the

conditions under which he or she was confined resulted "in unquestioned and serious

deprivations of basic human needs."  *Anderson v. Coughlin*, 757 F.2d 33, 35 (2d Cir.

1985) (citing *Rhodes v. Chapman*, 452 U.S. at 347).  The Eighth Amendment is

implicated for example, "when inmates are denied 'essential food, medical care, or

sanitation," or when conditions are such that the threat of violence among inmates is

28

increased." *Morgan v. Ward*, 699 F. Supp. 1025, 1054 (N.D.N.Y. 1988). Conditions of confinement are not cruel and unusual for Eighth Amendment purposes simply because they are "restrictive and even harsh." *Anderson v. Coughlin*, 757 F.2d at 35. Rather, many unpleasant aspects of prison life "are part of the penalty that criminal offenders pay for their offenses against society." *Id.* (citation omitted).

Satisfying the subjective element requires that the prisoner show that defendants acted with "deliberate indifference." *Wilson v. Seiter*, 501 U.S. at 302-03. A prison official acts with deliberate indifference to inhumane conditions of confinement where he "knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of the facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw that inference." *Farmer v. Brennan*, 511 U.S. at 137.

In this Circuit, proof that an inmate was subjected "for a prolonged period to bitter cold" is sufficient to raise a triable issue of fact as to the objective prong. *Gaston v. Coughlin*, 249 F.3d 156, 164 (2d Cir. 2001) (holding that summary judgment for defendants was precluded where prisoner was subjected to temperatures near or well below freezing in his cell for a five-month period); *see also Corselli v. Coughlin*, 842 F.2d 23 (2d Cir. 1988) (holding that summary judgment for defendants was precluded where prisoner was subjected to bitter cold in cell for three months); *Wright v.*

29

*McMann*, 37 F.2d 519, 526 (2d Cir. 1967) (vacating a dismissal on the pleadings where the complaint alleged that prisoner was deliberately exposed to bitter cold for periods of twenty-one days or more while in solitary confinement).

But where an inmate has not been subjected to "bitter cold" for a "prolonged period," the Second Circuit has held that summary judgment for prison officials is appropriate. *See Trammell v. Keane*, 338 F.3d 155 (2d Cir. 2003). In *Trammell*, the inmate was deprived of clothing and confined to his cell for a few weeks as a disciplinary measure. *Id.* at 159. The Second Circuit found that defendants were entitled to summary judgment because the inmate had failed to allege that his cell was open to the elements, lacked adequate heat, or that he had been subjected to "bitter cold." *Id.* at 165.

2.    Analysis

Here, Plaintiff argues that the recreation area was covered in ice, making it difficult for him to exercise because the cold would aggravate the pain in his feet. (Am. Compl. ¶ 33; Pl.'s Dep. at 55-57). Even if Plaintiff's allegations were true, he has failed to satisfy both the objective and subjective prongs of a conditions of confinement claim. Plaintiff was not exposed to "bitter cold" for a "prolonged period." He refrained from going to the recreation cages and there is nothing in the record to indicate that Defendants forced Plaintiff to be exposed to the cold. (Pl.'s Dep. at 57). Moreover,

Plaintiff's admission that Defendants provided galoshes to insulate his feet belie any claim that Defendants acted with deliberate indifference to expose Plaintiff to inhumane conditions. *Id.* at 55-56. Finally, as discussed more fully above, Defendants did not provide Plaintiff with his medical boots when he went to recreation because they were not medically necessary and they posed a potential threat to others.[13]

Accordingly, Defendants should be granted summary judgment on this basis.

## V.   **Equal Protection Claims**

### A.   **Legal Standards**

The Equal Protection Clause of the Fourteenth Amendment provides that the government shall treat all similarly-situated people alike. *Giano v. Senkowski*, 54 F.3d 1050, 1057 (2d Cir. 1995) (citing *City of Cleburne v. Cleburne Living Ctr.*, 473 U.S. 432, 439, 105 S. Ct. 3249, 87 L. Ed. 2d 313 (1985)). A plaintiff alleging a violation of his equal protection rights must first show that he was treated differently than others

---

[13] While deprivation of recreation privileges may state a constitutional claim, *see Williams v. Greifinger*, 97 F.3d 699, 704 (2d Cir. 1996), Plaintiff was not deprived of recreation privileges. Rather, by his own admission, he chose to refrain from recreation because he was not provided with medical boots, which he feels would have kept his feet warm. Defendants, however, provided galoshes so that Plaintiff's feet would be insulated from the cold. Still, Plaintiff continued to refrain from recreation. Thus, any deprivation, would have been the result of a choice made by the Plaintiff, which is insufficient for an Eighth Amendment claim based on conditions of confinement. *See Willard v. Ramsey*, No. 07-CV-1156, 2010 WL 786296, at *3 n.10 (N.D.N.Y. Mar. 2, 2010) (Mordue, C.J.) (holding meritless a prisoner's claim that his Eighth Amendment rights were violated by his conditions of confinement because the prisoner refused, after being offered, participation in recreation).

similarly situated because of intentional or purposeful discrimination, typically against an identifiable or suspect class, such as race or religion. *Phillips v. Girdich*, 408 F.3d 124, 129 (2d Cir. 2005). Then, the plaintiff must establish that the difference in treatment cannot survive the appropriate level of scrutiny. *Id.*

Strict scrutiny is used when "the classification drawn 'impermissibly . . . operates to the peculiar disadvantage of a suspect class.'" *Disabled Am. Veterans v. U.S. Dep't of Veterans Affairs*, 962 F.2d 136, 141 (2d Cir. 1992) (citing *Mass. Bd. of Ret. v. Murgia*, 427 U.S. 307, 96 S. Ct. 2562, 49 L. Ed. 2d 520 (1976) (footnotes omitted)). Suspect classes are those based on "race, alienage, or national origin, or those which discriminate against a group saddled . . . [with] political powerlessness as to command extraordinary protection from the majoritarian political process." *Id.* Classifications based on religion are also "inherent[ly] suspect." *Robles v. Dennison*, 745 F. Supp. 2d 244, 301 (W.D.N.Y. 2010) (citing *City of New Orleans v. Dukes*, 427 U.S. 297, 303, 96 S. Ct. 2513, 49 L. Ed. 2d 511 (1976)). To survive strict scrutiny, the "State must demonstrate a compelling governmental interest and show that the law is the least restrictive means of furthering its interest." *City of Boerne v. Flores*, 521 U.S. 507, 534, 117 S. Ct. 2157, 138 L. Ed. 2d 624 (1997).

Alternatively, an equal protection claim can sometimes be sustained even if the plaintiff does not allege "class-based" discrimination and instead claims that he has

32

been irrationally singled out as a "class of one." *Engquist v. Or. Dep't of Agric.*, 553 U.S. 591, 601, 128 S. Ct. 2146, 170 L. Ed. 2d 975 (2008) (internal quotations omitted). The Equal Protection Clause "secure[s] every person . . . . against intentional and arbitrary discrimination" by state officials. *Willowbrook v. Olech*, 528 U.S. 562, 564, 120 S. Ct. 1073, 145 L. Ed. 2d 1060 (2000) (*per curiam*)). Thus, in a "class of one" claim, the Equal Protection Clause requires a "rational basis for the difference in treatment." *Id.* (citing *Willowbrook v. Olech*, 528 U.S. at 564.

**B.     Analysis**

Plaintiff claims that the denial of adequate medical care for his feet and gastrointestinal problems, "constitute[] unequal protection of the law." (Am. Compl. ¶ 133).[14]  Plaintiff, who is black, was not permitted to wear medical boots while in the

---

[14] The Amended and Supplemental Complaints make conclusory allegations that the deprivation of adequate medical care for his visual, dental, and back problems, and that the issuance of the restraint order without due process of law, "constitute[] unequal protection of the law." (Am. Compl. ¶ 133; Suppl. Compl. ¶ 162). In responding to the summary judgment motion, however, Plaintiff has neither alleged nor offered any allegations or facts to suggest that the treatment for his visual, dental, and back problems violated the Equal Protection Clause. He has neither alleged nor shown that others similarly situated received different care, or that prison officials acted irrationally when treating those problems. This court concludes that any equal protection claim with respect to these medical care issues is mis-pled and essentially duplicates plaintiff's claim that the defendants were deliberately indifferent to his medical needs. *See, e.g. Hardy v. Diaz*, 9:08-CV-1352 (GLS/ATB), 2010 WL 1633379, at *8 (N.D.N.Y. Mar. 30, 2010) (vague and duplicative equal protection claim based on delays in treatment for Hepatis C virus treated as part of Eighth Amendment deliberate indifference claim) (Report-Recommendation), adopted, 2010 WL 1633390 (N.D.N.Y. Apr. 21, 2010); *Toney v. Goord*, 04-CV-1174 (TJM/ RFT), 2006 WL 2496859 at *10-11 (N.D.N.Y. Aug. 28, 2006). Finally, the alleged equal protection violation arising from the issuance of the restraint order should be analyzed under the Due Process Clause of the Fourteenth Amendment. *See infra* Point VI.

S.H.U. at Clinton.  (Pl.'s Mem. of Law at 18).  He argues that William Blake, a white inmate who also suffers from plantar fasciitis, was permitted to wear medical boots while in the S.H.U. at Great Meadow  (Pl.'s Mem. of Law at 18; Dkt. No. 115-2 at 15, Blake Aff. ¶¶ 5-7).  Plaintiff also appears to assert a "class of one" claim with regard to his gastrointestinal problems.  He argues that a Muslim inmate, Dennis Nelson, received the Kosher Diet while incarcerated at Green Haven Correctional Facility ("Green Haven").  (Pl.'s Mem. of Law at 18; Nelson Aff. ¶ 4).  But Plaintiff, who is also Muslim, was denied the Kosher Diet while incarcerated at Clinton.  (Pl.'s Mem. of Law at 18).

Without more, Plaintiff has not shown that any *Clinton* officials treated him differently because of his membership in a suspect class or that *Clinton* officials intentionally or arbitrarily discriminated against him.[15]  Personnel at Clinton would have no control over or responsibility for the medical care of inmates at other facilities; so a comparison of how isolated inmates at other institutions were treated does not support an equal protection claim against any Clinton official.  Moreover, Plaintiff has neither shown nor alleged the personal involvement of Defendants Fischer and Wright, who are both DOCS officials, in any alleged violation of the Equal Protection Clause.

---

[15]  Plaintiff claims that Rabbi Friedman denied the request for the Kosher Diet because Plaintiff is Muslim.  (Defs.' Mem. of Law at 16; *see also* Dkt. No. 115-7, Pl.'s Exh. 30).  Rabbi Friedman, however, is not a defendant in this action.

Accordingly, I recommend granting Defendants' motion for summary judgment as to Plaintiff's equal protection claims.

## VI.  <u>Due Process Violations</u>

### A.    **Legal Standards**

To prevail on a procedural due process claim under section 1983, a plaintiff must show that he possessed a protected property or liberty interest, and that he was deprived of that interest without being afforded sufficient procedural safeguards.  *See Tellier v. Fields*, 280 F.3d 69, 79-80 (2d Cir. 2000); *Hynes v. Squillace*, 143 F.3d 653, 658 (2d Cir. 1998).  Due process generally requires that the state afford individuals "some kind of hearing" prior to depriving them of a liberty or property interest.  *DiBlasio v. Novello*, 344 F.3d 292, 302 (2d Cir. 2003).

An inmate's protected liberty interest is implicated where the punishment at issue imposes an "atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life."  *Sandin v. Conner*, 515 U.S. 472, 484, 115 S. Ct. 2293, 132 L. Ed. 2d 418 (1995).  The Second Circuit has refused to set a bright line rule on when confinement becomes atypical.  Instead, "in order to determine whether a liberty interest has been affected, district courts are required to examine the circumstances of a confinement and to identify with specificity the facts upon which [their] conclusions [are] based."  *Wright v. Coughlin*, 132 F. 3d 133, 137 (2d Cir. 1998) (citations omitted).

35

**B.     Analysis**

Here, the restraint orders required Plaintiff to be in restraints whenever he left his cell, except when he would go to recreation.  (Pl.'s Dep. at 69-70; Dkt. No. 109-12, Racette Exh. D).  Plaintiff argues that the restraint orders violated his due process rights because he did not receive a misbehavior report prior to being issued the restraint orders.  (Am. Compl. ¶ 117; Pl.'s Dep. at 70).  The Court concludes that Plaintiff does not have a liberty interest in being free from restraints while out of his cell.  Placing a prison inmate in restraints does not impose the "atypical and significant hardship" envisioned in *Sandin*.  *See, e.g.*, *Brown v. Coughlin*, No. 93-CV-0633E(H), 1995 WL 643349, at *3(W.D.N.Y. Oct. 13, 1995) (Elfvin, J.) (concluding that an S.H.U. inmate "does not have a liberty interest in being unencumbered by mechanical restraints during his exercise period").  As such, Plaintiff's due process claim fails as a matter of law as he had no liberty interest that would trigger due process protections.[16]

Accordingly, I recommend granting Defendants summary judgment on this basis.

---

[16]  Plaintiff argues that the restraints also violated DOCS Directive 4933 § 305.4(e).  (Pl.'s Mem. of Law at 24).  DOCS Directive 4933 § 305.4(e)(viii) states: "If an inmate is under a restraint order directing that he/she be mechanically restrained *whenever* (emphasis in original) he/she leaves the S.H.U. cell for any reason, the inmate will remain mechanically restrained during the entire period of time he/she is out of the SHU cell, except . . . . when in a general population visiting room and not in a noncontact area."  Section 3054(e)(vii) was not violated because Plaintiff was placed in restraints while in the S.H.U. visiting room, not the general population visiting room.  (*See* Racette Exh. D; *see also* Dkt. No. 115-6, Pl.'s Exh. 20 (letter from Plaintiff and affidavit of Plaintiff's fiancée noting that the visits occurred in the S.H.U. visiting room)).

**VII.** <u>**Conclusion**</u>

**WHEREFORE**, based on the findings above, it is

**RECOMMENDED**, that Defendants' motion for summary judgment (Dkt.

No.109) be **GRANTED** and the complaint **DISMISSED IN ITS ENTIRETY**.

Pursuant to 28 U.S.C. § 636(b)(1) and Local Rule 72.1(c), the parties have

fourteen (14) days within which to file written objections to the foregoing report.

Such objections shall be filed with the Clerk of the Court.  **FAILURE TO OBJECT**

**TO THIS REPORT WITHIN FOURTEEN DAYS WILL PRECLUDE**

**APPELLATE REVIEW.**  *Roldan v. Racette*, 984 F.2d 85, 89 (2d Cir. 1993) (citing

*Small v. Sec. of Health & Human Servs.*, 892 F.2d 15 (2d Cir. 1989)); 28 U.S.C.

§ 636(b)(1); Fed. R. Civ. P. 6(a), 6(e), 72.

Dated: July 25, 2011

Hon. Andrew T. Baxter
U.S. Magistrate Judge

37